

FILED

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

2017 MAY -5  PM 3: 05

CLERK
MIDDLE
JACKSONVILLE DISTRICT

James P. Sletteland,

                    Plaintiff

v.                                          Case No. 3:17-cv-520-J-39JRK

John Douglas Dunn, Jr.,
James Clinton Dunn,
William Middleton,
Lois D Shingler, Esq,
Ms. Ji Young Song,
Ms. Jeong-Hwa Lee Towery, Esq.
and
Georgia Businesses and Companies
Alliance Bus Group Inc.
CAIO North America LLC
Nelson, Mullins, Riley & Scarborough LLP,

                    Defendants

## COMPLAINT AND DEMAND FOR JURY AND INJUNCTION RELIEF SOUGHT
## LIST OF CAUSES OF ACTION COUNTS

1. ALIENATION OF AFFECTION

2. VIOLATION OF THE PLAINTIFF'S (FATHER'S) CONSTITUTIONAL RIGHTS
   TO ENJOY AND EDUCATE HIS CHILD;

3. INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;

4. BREACH OF GOOD FAITH/FAIR DEALING IN VIOLATION OF FIDUCIARY
   DUTIES;

5. FRAUD, INTENTIONAL AND NEGLIGENT MISREPRESENTATION, AND NON-DISCLOSURE OF MATERIAL FACTS

**JURISDICTION AND VENUE**

1. Plaintiff is a citizen and resident of St. Johns County, Florida and has been a citizen of the USA since his birth.

2. All individual Defendants are citizens and residents of the State of Georgia.

3. The Defendants that are Georgia businesses and companies are, and always mentioned in this complaint were or are, corporations or limited liability partnerships duly organized and existing under the laws of the State of Georgia, with their principal place of business in Atlanta, Georgia.

4. Defendants Messrs. J. Douglas Dunn, Jr. (Mr. Dunn) and Middleton work as the CEOs (Mr. Dunn is the majority owner of the Alliance Bus Group (ABG) and CEO of the CAIO North America LLC (CAIO NA) (an affiliate of a large bus manufacturer in Brazil-CAIO), respectively. The Defendants (i.e., Dunn and Middleton) are the respective registered representatives for Defendants ABG and CAIO NA in the State of Georgia. Beginning in 2013 and thereafter, the Defendants conducted business in Brazil, Florida, Georgia and other southeastern states in the USA.

5. The Plaintiff was in a long-term relationship with Claudia Vianna (the "Mother" or "Ms. Vianna"), a Brazilian national, which began in 2004, and the couple had one daughter (the "Child") that was born in April 2006 in Brazil and was their legitimate child under

Brazilian law. In late 2006, the Child was naturalized by the Plaintiff and became a US Citizen, when the Plaintiff, Mother and Child were living together in Rio de Janeiro, Brazil.

6.   In the 2013, Defendants, Mr. Dunn and William (Mark) Middleton traveled to Brazil often and stayed at various hotels and sometimes at the Mother's condo in Sao Paulo, Brazil during their visits.

7.   The intentional and negligent acts of the Defendants have given rise to the filing of this Complaint and occurred, as set out below, while the some or all the Defendants physically present in Brazil, Georgia, Alabama, Florida and Tennessee.

8.   This court has subject matter jurisdiction over this action under *28 U.S.C. § 1332(a)(1)* because there is complete diversity of citizenship between Plaintiff and all the Defendants and because the matter in controversy, excluding interest and costs, exceed the sum of $75,000.

9.   This court may exercise jurisdiction over the Georgia businesses and companies, because these Defendants have continuous and substantial contacts with the State of Florida, including, but not limited to, the distribution, sale, repair or rental of buses throughout the State of Florida, as well as in all other states of the United States.

10. Venue for this action is proper under *28 U.S.C. § 1391(b)(2)* in the Middle District of Florida because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

11. Before the Plaintiff met Ms. Vianna in 2004, the Mother of the Child in question, was part of Brazil's underground, where prostitution is legal, taxes are not paid, cash is king and this cash is parked with other people, so nothing is held in their real names. Ms. Vianna is allegedly "poor", per her own admissions, and has collected money or in kind compensation from the Plaintiff and the Defendants without paying taxes or filing tax returns in Brazil or the USA for over a decade.

12. In 2004, their relationship grew because the Plaintiff thought he could "rescue" Ms. Vianna from her poor and immoral life. Ms. Vianna lived in a small studio apartment with another woman, who was also a "woman of the night".

13. On or about August 2005, Ms. Claudia De Araujo Vianna, a Brazilian national of about 36 years old, came to New York on a plane ticket purchased by the Plaintiff, who was legally separated from his x-wife of 32 years.

14. On or about October 1, 2005, Ms. Vianna told the Plaintiff that she was pregnant and was going to have his Child. The Plaintiff was shocked as Ms. Vianna was on birth control pills. Later, the Plaintiff agreed to move to Rio de Janeiro, Brazil to live with Ms. Vianna

and full take responsibility for the Child. From approximately 2005 to 2009, the couple and their Child lived in in Ipanema Beach, Rio de Janeiro, Brazil.

15.  Prior to and at the time of the pregnancy, the Plaintiff paid for all living expenses, pre-natal care and certain extensive medical exams to assure the couple would have a healthy child.  On April 2, 2006, the couple had a daughter (the "Child") in Brazil. The Child was born healthy and both parents, the Plaintiff and Ms. Vianna were listed on the Child's birth certificate, so the Father was the legitimate Father of the Child.  The Plaintiff worked out of their apartment. Ms. Vianna did not work nor did she look for work. Ms. Vianna and the Father both took care of Child.

16.  Three months after the Child's birth, the Plaintiff naturalized the Child as an US Citizen. The Plaintiff accepted full financial and moral responsibility for the Child. Ms. Vianna sworn under oath that the Plaintiff was the Father at the US Consulate in Rio de Janeiro, Brazil. The Child now has dual citizenship, one in Brazil and one in the USA.

17.  During the next several years, the couple enjoyed the Child and raised the Child together. The Child was attended a small private school in Ipanema.  The Plaintiff took the Child to and from the school every day. The family enjoyed the beach, zoo and many other activities. Ms. Vianna was a "stay at home mother" and the Plaintiff was solely financially responsible for the support of the family.

18. On or about 2009, the global recession hit the world hard, especially a third world countries like Brazil. The Plaintiff's business failed and his consulting work dried up in Brazil. Before the Plaintiff's funds were totally exhausted, the couple agreed for the Plaintiff go back to the USA to find work and to send money to Ms. Vianna and the Child. The Child and the Mother would live at her grandmother's house in Canoas, Brazil until the Plaintiff would either send for them to live in the USA or the Plaintiff could move back to Brazil with good job.

19. During this period of separation, the couple and Child emailed, texted and talked on Skype to each other almost daily. The Plaintiff, at 59 years old, looked hard for work and found some part-time consulting work. Most of these monies earned by the Plaintiff were used for living expenses for Ms. Vianna, the Child and her family. The monies would be wired to Ms. Vianna in Brazil and the Plaintiff would bring monies to Ms. Vianna on his many trips to Canoas, Brazil.

20. On his first trip, back to Canoas, Brazil from New York, the Plaintiff found that the Child was unhappy because she was attending a low level, private school. Immediately, the couple visited many schools and the best and most expensive school in Canoas was chosen. The school taught three languages, ballet, Brazilian kick boxing and had small classes. For the first week, the Plaintiff alone took the Child to school and stayed for the entire day until the Child became familiar and stable at the new school.

21.  During this and many other visits to Canoas lasting many weeks or months at a time,
the Plaintiff paid for many household expenses, furnished the garage apartment,
bought fans, washers, refrigerators, repaired plumbing, build patios, health care costs,
etc. On every visit to Canoas, the Plaintiff brought clothes, TVs, DVD player, a girl's
bicycle, toys, and Victoria Secret goods, so Ms. Vianna's mother could sell them at her
small store for a good profit.  Ms. Vianna did not work nor did she look for work. The
Child was happy and loved her school. Ms. Vianna's family was living a better life
because of the money and goods paid for by the Plaintiff.

22.  The global recession lingered on and work was hard to find in the USA, Brazil or
anywhere for that matter. The Plaintiff was blessed because a good friend gave him free
lodging and food for almost three (3) years in Long Island, New York.  This allowed
Plaintiff to make some money and pay minimal living expenses. The Plaintiff scrambled
to earn a living at 59 years old during the global recession.  Every chance the Plaintiff
had he traveled to Canoas, Brazil to see his Child.

23.  On or about September 2010, the Plaintiff returned to Sao Paulo, Brazil to look for work
in Brazil and then go to Canoas, Brazil to visit his Child, Ms. Vianna and her family.  He
telephoned the Canoas, Brazil home from Sao Paulo, Brazil, only to find that Ms. Vianna
was already in Sao Paulo.  Ms. Vianna informed the Plaintiff that she was not going back

to Canoas until Christmas time. The Plaintiff was upset, in part, because he felt that one of the Child's parents needed to be with the Child.

24. Ms. Vianna insisted that she needed to "work". Naturally, the Plaintiff was afraid that she was going back to work in the "oldest profession in the world". The Plaintiff could not convince Ms. Vianna to go back to Canoas and take care of the Child. So, for the next three (3) months, the Plaintiff lived in Canoas, Brazil and took full time care of the Child and worked remotely from Brazil.

25. After months in Sao Paulo, Ms. Vianna returned with no money at Christmas and told the Plaintiff she could not find a full-time job. When Ms. Vianna arrived home, she demanded that the Plaintiff leave the house before Christmas. The Plaintiff refused and moved into Ms. Vianna's brother's side of the house. The Plaintiff stayed until after New Years and then left for New York, but the Plaintiff continued to support the Child and Ms. Vianna.

26. During 2011, Ms. Vianna and the Plaintiff reconciled. Ms. Vianna and the Child travelled to Long Island, New York to stay with the Plaintiff for the Child's 5th birthday in the Spring of 2011 for up to 45 days. The Child wanted to stay with then Plaintiff, but Ms. Vianna said "No". To sooth the Child's disappointment, the Plaintiff, Father, promised the Child that he would come to visit her in a few months in Canoas. The Child calmed down and looked forward to the Father's visit.

27. On or about June 2011, the Plaintiff flew to Canoas from New York (a 16-hour airline trip), as the Plaintiff had promised to visit the Child. He arrived at the house only to find out that the Child was already home from school and in the back of the house.  Ms. Vianna would not let the Father see the Child.  The Plaintiff was very upset, but he checked into a local hotel. The next day, the Father went to the Child's school, but the Child for the next three (3) days was deliberately kept out of school by Ms. Vianna. Finally, the Plaintiff left bags of toys and clothes and returned to New York extremely distraught.  Subsequently, the couple talked, Ms. Vianna wanted more money and the Plaintiff gave it to her to keep the peace and the family together.

28. During the summer of 2011, Ms. Vianna planned to have breast enlargement surgery and did not to tell the Plaintiff. However, the Plaintiff demanded to see the Child and he travelled to Canoas, Brazil. Ms. Vianna allowed the Plaintiff to visit the Child, as she had just had the surgery and needed money to pay for the plastic surgery. The Plaintiff paid for the plastic surgery because he wanted peace and to see his Child. The Plaintiff asked Ms. Vianna to marry him and she accepted, so they were formally engaged with a diamond ring brought by the Plaintiff from the USA.

29. Without telling the Plaintiff in the Spring of 2012, Ms. Vianna packed up and left Canoas, Brazil to move to Sao Paulo, Brazil. The Child was uprooted and enrolled in a sub-standard private school a few blocks from the condo that the Mother was living in.

30. In 2013, two of the Defendants Dunn and Middleton, were introduced to Ms. Vianna in Sao Paulo, Brazil. Mr. Dunn, the CEO of the ABG, its majority owner, and the majority owner of the joint venture along with partner Defendant Middleton, CEO of CAIO NA (an affiliate of one Brazil's largest bus manufacturers named CAIO). The business concept was for ABG's USA dealerships to exclusively sell Brazilian CAIO manufactured busses throughout the USA.

31. Since Mr. Dunn's separation from his first wife, Mr. Dunn began traveling many times "on business" to Brazil. Upon information and belief, Ms. Vianna may have been retained by CAIO to escort Mr. Dunn. This introduction was to help assured CAIO and CAIO NA that ABG's bus dealerships would promote and sell CAIO's products in the USA. CAIO did not have enough cash to invest in ABG, like other Brazilian bus manufacturers did to secure the distribution of their buses in the USA. For example, Marco Polo, the largest Brazilian bus manufacturer, secured its relationship with a major US bus dealer by making a multi-million USD investment in a US bus dealer to sell their buses. In this case, CAIO paid for a Brazilian woman, like Ms. Vianna, to help secure an exclusive deal with ABG, a multi-state USA bus dealer and distributor.

32. After all, Ms. Vianna was an alleged "high-class call girl" from Sao Paulo, who speaks some English and hunts for rich foreigners, so they can become her "sugar daddy". Ms. Vianna traveled to Atlanta and other vacation spots such as Mexico and the US Virgin

Islands to do "business with Mr. Dunn".  In Atlanta, they would stay at his luxury
condominium worth $700,000 or his $1.0 million lake house in Alabama. Mr. Dunn
showered Ms. Vianna with gifts and presents.

33.  In 2013, the Plaintiff traveled to Sao Paulo and stayed in a small hotel to see his Child
for about one month.   Ms. Vianna continued to have sexual intercourse with the
Plaintiff.  The Child could stay with the Plaintiff at his hotel during weekends and during
some school nights. The Plaintiff stayed at the Mother's condo for only a few days with
the Child, before he left for New York, because Mr. Dunn had been staying at the Ms.
Vianna's condo.

34.  In 2013, the Plaintiff and Ms. Vianna discussed having Ms. Vianna and the Child come
for the summer of 2013 to New York. The Plaintiff wanted the Child to begin school in
Long Island, NY.  Instead, the Child spent most of the 2013 summer with her
grandmother in Canoas, Brazil and had almost daily conversations with the Plaintiff. This
was because Ms. Vianna wanted to be with Mr. Dunn.

35.  In the fall of 2013, Ms. Vianna agreed to come to New York with the Child for
Christmas/New Years for about 45 days.  A new Brazilian passport and US visas were
paid for by the Plaintiff for the Mother and a new US and Brazilian passport for the Child.

36.  Ms. Vianna and the Child arrived on or about December 15, 2013. The Plaintiff had
purposely moved to one of the best school districts in Long Island, NY. The Plaintiff was

discussing with Ms. Vianna that the Child be allowed to stay and go to school in January 2014. But, Ms. Vianna and the Defendants had other plans.

37.    After Christmas Day in 2013, Ms. Vianna trained into New York City to stay at an unknown location. The Plaintiff sensed something was wrong with Ms. Vianna, who arrived back at the Plaintiff's apartment a few days later and was a "changed person". The Plaintiff and the Child continued to do many fun things such as go to drama plays, snow making, judo school and seeing Christmas shows. Ms. Vianna mostly sat on her phone allegedly having video sex with Mr. Dunn, while the Child slept in the same bedroom.

38.    Shortly after Ms. Vianna and the Child returned to Brazil, Mr. Dunn, Ms. Vianna and other Defendants developed a plan to "erase the Plaintiff from the Child's life" by taking the Child to Atlanta and controlling the Child's education, activities and limiting visitation by the Father.  Ms. Vianna, with direction and significant financial support from the Defendants, filed for custody and child support in the Sao Paulo, Brazil Family Court system, which was totally unknown to the Plaintiff.

39.    Ms. Vianna started to alienate and psychologically brainwash the Child against her Father, the Plaintiff, because she needed to protect her special relationship with Mr. Dunn because he had a "bigger wallet" than the Plaintiff.  The Mother falsely stated to the Brazilian Family Court that the Plaintiff had long ago abandoned the Child.  On April

Page **12** of **53**

16, 2014, a written notice in Portuguese was printed in a Sao Paulo, Brazil paper stating that the Plaintiff had abandoned the Child many years ago, and she did not know the location of the Plaintiff.   Yet, Ms. Vianna and the Child had been at the Plaintiff's residence in New York a few months ago, for Christmas and New Years in 2013-2014 for 45 days and they all frequently talked by email, texts and Skype.

40.   Ms. Vianna swore to the Brazilian Court that she did not know where the Plaintiff was in the US.  Ms. Vianna had the Brazilian Court search for any money that the Plaintiff may have in Brazilian banks, so Ms. Vianna could seize those funds for child support. A Brazilian "public defender" was appointed to represent the Plaintiff, the Father, in Brazil.   Ms. Vianna acted with the active direction, support and money of the Defendants.

41.   All during this time, Ms. Vianna kept up e-mail, texts and phone calls with the Plaintiff and said nothing to the Plaintiff about the Brazilian Court actions. The Plaintiff continued to call his Child regularly and asked Ms. Vianna many times to visit her in Brazil or in the USA.

42.   Then in May of 2014 by e-mail, Ms. Vianna demanded sole physical custody for the Child, child support of $50,000 per year and $20,000 per year for private school because Ms. Vianna was going to live with an "unknown man" at an "unknown address" (i.e., Mr. Dunn who was a married man in Georgia, until January 2015).

43. Ms. Vianna's demands were not acceptable because the Plaintiff would not allow his

Child to live in an "unknown place" with an "unknown man". Only a wealthy Father

could pay the child support demanded by Ms. Vianna. Ms. Vianna would and did not

disclose Mr. Dunn's name to the Plaintiff.    Ms. Vianna stated it was "none of the

Father's business" to know who and where his Child was going to live with in Atlanta.

Ms. Vianna stated that if the Plaintiff did not agree to her terms, then Ms. Vianna would

deny him visitation of the Child and she did just that. After that, Ms. Vianna did not

allow the Child to visit the Plaintiff without a Brazilian Court Order.

44. In August 2014, Defendants Dunn and Middleton hired Ms. Vianna for "no show" job.

ABG sponsored Ms. Vianna for a H3 temporary US work visa with Mr. Dunn being her

supervisor. Ms. Vianna continued to protect Mr. Dunn's identity, but Defendant Dunn

could not wait until he was divorced to bring Ms. Vianna to live in his luxury penthouse

condo in Buckhead, Atlanta, Georgia. In the summer of 2014, Ms. Vianna traveled alone

to Atlanta and agreed to have the Defendants apply for and get Ms. Vianna, a H3

temporary US work visa.

45. Several of the Defendants were retained by ABG and Mr. Dunn to apply for a H3

temporary US work visa for Ms. Vianna. The immigration lawyers were told all, part of

or none of the actual, true facts surrounding the situation. The material facts told by

Defendants were fraudulent and were mispresented in ABG's application for a H3

temporary US work visa for Ms. Vianna.  The same law firm, a Defendant herein, represented ABG in its acquisition of several USA bus dealerships was retained to help ABG secure the H3 temporary US work visa for Ms. Vianna.

46.  On about October 2014, the Plaintiff travelled to Sao Paulo, Brazil to fight for his parental rights for the Child.  The Plaintiff hired Brazilian lawyers and fought to visit the Child, which was met with strong resistance from Ms. Vianna at the direction of the Defendants, who were paying the Ms. Vianna's legal bills to get sole physical custody, child support and deny the Plaintiff's rights of visitation, unless Court ordered.

47.  At great expense, the Plaintiff stayed in Sao Paulo, Brazil for about 40 days waiting to see his Child. The Plaintiff secured only few days and one weekend of limited visitation with his Child because it was ordered by the Brazilian Judge.  The Plaintiff also secured a 25-day visit Brazilian Court order beginning on December 28, 2014 to January 2015 to visit with his Child in Florida.

48.  On or about December 15, 2015, Ms. Vianna reapplied to the Brazilian Court for permission to take the Child to Atlanta to live with Mr. Dunn, whose company, ABG, had procured a H3 temporary US work visa for Ms. Vianna. Ms. Vianna produced 55 pages of documents for the Custody Court. Mr. Dunn was not mentioned by name in these papers, but many Dunn family members, friends and Mr. Dunn's joint venture partner, Mr. Middleton, were mentioned.

49. These court fillings showed that beginning in August 2014, that Ms. Vianna was being paid $4,000 USD per month in "wages" from CAIO NA. Six (6) months before, Ms. Vianna had filed with the Brazilian Court that she had "no money" and her Mother alone had supported Ms. Vianna and the Child for many years. In total, Ms. Vianna had been wired $25,000 (USD) designated as "wages" to her Brazilian Bank, but Ms. Vianna swore she had no money.

50. To date, ABG and CAIO NA have not answered or even acknowledged two validly issued subpoenas in Fulton County, Georgia Superior Court for information on the scope of work, Ms. Vianna's activities, wages paid to Ms. Vianna, and they have not disclosed the complete ABG H3 Visa application for Ms. Vianna's H3 temporary US work visa issued in December 2014. The H3 temporary US work visa rules and policies do not provide for American CEOs to hire their foreign "sex partners", "poor girlfriends" or "fiancé" or "kept woman" for "no show" jobs under H3 temporary US work visas to enter the USA and to displace US workers.

51. Visa benefit fraud has been committed by the Defendants because without the H3 visa, Ms. Vianna could not have entered the USA to stay with Mr. Dunn along with the Child. The H3 visa application was filed for on or about August 2014. Mr. Dunn and Ms. Vianna were already engaged in May 2014.

52. The Defendants' plan was to move forward with ABG H3 temporary US work visa application because almost 95% of H3 visa applications had been granted in 2013. The Defendant's plan was to deprive the Plaintiff of his parental rights because the Defendants did not know when Mr. Dunn was going to be divorced at that time. Mr. Dunn did not want the situation to interfere with the highly contentious financial negotiations surrounding his divorce.

53. Mr. Dunn's first wife filed for divorce from Mr. Dunn because of his 8-year affair with ABG's CFO. Also, Mr. Dunn was often traveling to "work" in Brazil with Ms. Vianna and at the same time keeping up the relationship with the ABG's female CFO.

54. Mr. Dunn hid payments to Ms. Vianna from the ABG's CFO and his first wife during their divorce proceedings because they would have become suspicious seeing payments directly to Ms. Vianna from ABG and a reasonable divorce settlement may have evaporated. Mr. Dunn asked Mr. Middleton to pay wages to Ms. Vianna and legal expenses to fight the Plaintiff in Brazil and Atlanta.  Mr. Middleton complied with Mr. Dunn's request because Mr. Dunn owned CAIO NA.

55. Ms. Vianna told the Brazilian Court in 2014 that she was "poor", had no assets and could not even pay the Brazilian Court fees.  Ms. Vianna stated that her Mother, was supporting Ms. Vianna and the Child. The money was coming from the Defendants.

56. Prior to the issuance of Ms. Vianna's H3 temporary US work visa in December 2014, Ms. Vianna had applied to the Atlanta Public Schools (APS) without naming the Plaintiff, as the Child's Father. Ms. Vianna also listed most of Defendant Dunn's close relatives and some of Defendant Dunn's friends as people authorized to pick up the Child at school. Mr. Dunn, who she would be living with Atlanta, was not authorized to pick up the Child or on was mentioned on the APS application for the Child.

57. Mr. Dunn headed to "Brazil" for 2014 Christmas to be with Ms. Vianna and her family in Canoas, Brazil.

58. In December 2014, Ms. Vianna planned to bring the Child into the US. Ms. Vianna and the Child were supposedly going to fly on a 11PM Delta flight to Atlanta and then to fly to Jacksonville for the Child to visit the Plaintiff under the Brazilian Judge's order. Mr. Dunn had already flown back on the earlier 10PM Delta flight to Atlanta to wait for the arrival of Ms. Vianna and the Child, so that they could both enter the USA in Atlanta and go immediately to Defendant Dunn's penthouse condo in Buckhead, Atlanta, Georgia and the Child would start school. After all, Ms. Vianna had procession of both the Child's passports (US and Brazilian).

59. This plan resembled a classic human smuggling and child trafficking plan, which was now possible because Ms. Vianna had a validly issued H3 temporary US work visa and the Child was naturalized as a US citizen at the age of three (3) months. The Plaintiff

would then have to litigate for his Child all over again in Fulton County, Georgia because Ms. Vianna and the Child would both be legally in the US.

60. The Plaintiff and his Brazilian lawyers suspected Ms. Vianna and the Defendants would try something like this. The Plaintiff flew to Sao Paulo, Brazil on Christmas Day in 2014. On December 26, 2014, a Brazilian Emergency Court Order was issued to have Ms. Vianna give the Child's two passports to the Plaintiff and then all three parties would travel on the same Delta Flight to Atlanta, go through customs and then go to Jacksonville, Florida, where Ms. Vianna would leave the Child for the 25-day Brazilian Visitation Court ordered visit with the Plaintiff, so the Child and the Plaintiff could finally have parenting time together.

61. For several days in Brazil, Ms. Vianna avoided personal service by the Brazilian Emergency Court Officer at her Brazilian condo by telling the doormen she was out or in the shower, when she went out the back door or into the basement garage. On December 28, 2014 at 10pm at the Sao Paulo Airport, a Brazilian Court Officer, a Brazilian Federal Police Officer and the Plaintiff found Ms. Vianna and the Child at the gate trying to board the 11pm Delta flight to Atlanta. Ms. Vianna was served with the Brazilian Emergency Court Order at the airport. Ms. Vianna refused to give up the Child's passports and the 11 PM Delta flight departed to Atlanta without Ms. Vianna, the Child or the Plaintiff. For the next three hours, Ms. Vianna accosted the Plaintiff in

the Sao Paulo, Brazil airport. The Child cried and was traumatized. This was because Ms. Vianna had no intention of going to Jacksonville, Florida to drop the Child off for the Father's visit ordered by the Brazilian Court.

62. The next day in the Brazilian Emergency Court, Ms. Vianna's counsel argued that the Brazilian Judge was on vacation until January 20th and the Brazilian Emergency Judge could not amend his order to have Ms. Vianna surrender the Child's passports. The Plaintiff was told by the Brazilian Emergency Court that if the Child went to and entered the USA in Atlanta that the Brazilian Courts would have no jurisdiction over the Child. Upon advice of Brazilian counsel, the Plaintiff revoked his written travel authorization to travel out of Brazil to keep the Child safe in Brazil until custody was decided in late February 2015.

63. In January of 2015, Mr. Dunn got divorced and the Defendants have tried repeatedly to bury their H3 visa benefit fraud. In February 2015, Ms. Vianna switched Brazilian lawyers to the most expensive Brazilian family lawyers and these lawyers were paid for by the Defendants.

64. In late February 2015, Ms. Vianna showed up to the Brazilian Court flashing an engagement ring, designer clothes and a new handbag with Mr. Dunn in tow. Under oath, Ms. Vianna testified that she wanted to "work" in the US under her H3 visa and had no present intention to marry Dunn. Ms. Vianna claimed she knew nothing about

H3 visas in the US because the Defendant's company, ABG, had arranged everything. This custody hearing had no discovery and the Plaintiff was not allowed to testify.

65. About two weeks later, an extraordinary decision was issued by the Brazilian Court Judge, Ms. Vianna was granted the right to move with the Child to Atlanta to live with Mr. Dunn under his company's sponsored temporary H3 work visa for two years. The Brazilian Court Judge made his decision without ordering any independent mental examinations for the Mother, Father or the Child, even after the Brazilian Guardian for the Child demanded these mental exams considering Ms. Vianna's history of mental illness.

66. The Plaintiff believes that one or more of the Defendants allegedly fixed this case by bribing the Judge, as it is common in Brazil to fix court cases because corruption permeates Brazilian business, politics and culture. In this case, an alleged Brazilian "call girl" with no visible means of support was allowed to enter the US on a H3 temporary US work visa applied for by the CEO of the Company, who intended to live with her and the Child of the Plaintiff in Atlanta.

67. The Defendants with the possible unwitting aid of Ms. Vianna, a Brazilian national, could gain temporary control of the Child, who is an American citizen, to alienate the Father of the Child. There has been the brainwashing, abuse and neglect of a minor, US citizen Child by the Defendants to "erase" the daughter's American Father, the Plaintiff. While

this case may be founded in sexual lust/addiction or for economic gain or both, this case must be also looked at as a tortious case, which has interfered with the Plaintiff's constitutional rights.

68. According to Homeland Security and their sister agencies, there is no "bomb" or terrorist act involved by a substantial group of individuals, so why consider this case for criminal prosecution. The Plaintiff believes that this case should have been looked at as human smuggling and child trafficking case as well as visa benefit fraud.

69. This case did not end with the May 3, 2015 traveling of Ms. Vianna and the Child to live with Mr. Dunn in Atlanta. It began all over again and the Defendants continued to pay for Ms. Vianna's lawyers and adopted a "scorched earth defense" on behalf of Ms. Vianna. Thus, the Plaintiff would have to respond with equal legal power and costs until the Plaintiff's funds run out, which they did on or about May of 2016. The Plaintiff would then be forced to allow Ms. Vianna and Mr. Dunn to take control and have final decision on all matters regarding the Child because the Plaintiff would be representing himself on an indigent and pro-se basis, after the Plaintiff's previous law firms exhausted hundreds of thousands of legal fees and expenses.

70. Every request for visitation and involvement in the Child's life by the Plaintiff has either been denied or had to be fought out between the lawyers at great expense, since the Defendants became involved.

71. After months of negotiations and an all-day mediation session (directly participated by Mr. Dunn, when he was not married to Ms. Vianna) there was no settlement. Ms. Vianna was directed by and financially supported by the Defendants, which meant that the Child would be continually controlled and all final decisions would be made by Ms. Vianna.

72. Today, the litigation goes on and the money is being poured into this case and the Plaintiff has been stopped by the Defendants from enjoying his Child because they have exhausted all the Plaintiff's funds. The Defendants have assisted Ms. Vianna in a carefully orchestrated a planned scheme to deny a Father his constitutional rights to enjoy and educate his Child.

73. Plaintiff is informed and believes, and on various bases alleges, that each of them, knowingly, maliciously, and willfully conspired and agreed among themselves to tortuously or unlawfully to injure the Plaintiff by committing the acts alleged here in furtherance of their conspiracy and agreement.

74. Plaintiff is further informed and believes, and on various bases alleges, that the Defendants, and each of them, knowingly and willfully conspired to formulate, plan, and execute their plan on a continuous basis for over several years for, among other things, for financial gain, with the knowledge that in doing so it would destroy the reputation and well-being of Plaintiff.

75.  Plaintiff is also informed and believes, and on various bases alleges, that the tortuous course of conduct and the illegal acts described in this complaint were done in furtherance of the objectives of the conspiracy, all to the Plaintiff's damage, as alleged.

76.  Plaintiff is also informed and believes, and on various bases alleges, that Defendants, jointly and severally, furthered this conspiracy by ratifying and adopting the acts of each of the other members of the conspiracy. As a legal result of this conspiracy, the Plaintiff has suffered the damages set forth here, which were and proximately caused jointly and severally by each Defendant.

77.  Plaintiff is informed and believes, and on various bases alleges, that the Defendants, and each of them, knew of some or all the wrongful acts described below, and that they nevertheless knowingly assisted in the performance of those wrongful acts, or otherwise participated in furtherance of the conspiracy to Plaintiff's damage, as alleged.

78.  The Defendants, and each of them, acted with actual malice about the systematic destruction of the Plaintiff's rights. That is, the Defendants each had actual knowledge that the disputed their actions would lead to false statements and misrepresentations to Homeland Security and its sister agencies, the Brazilian Courts and the Fulton County, Georgia Superior Court, was degrading to Plaintiff, and invaded Plaintiff's right to enjoy his Child, or in the alternative, acted in reckless disregard of the Plaintiff's rights to enjoy his Child.

79. The Defendants, and each of them, had actual knowledge that the carrying out of the plan to allow Ms. Vianna to come to the USA based upon fraudulent circumstances and that this would have injurious impact on Plaintiff, but particularly the Child.

80. *Relationship of Defendants.* Plaintiff is informed and believes, and on that basis alleges, that now and at all times herein mentioned, each of the Defendants was and is the agent, employee, employer, servant, representative, partner, and/or co-venturer of each of the other Defendants and was acting, and is acting, within the scope of such authority and relationship and with the knowledge, approval, consent, and ratification of the other Defendants as applicable in each of the transactions, events, or other matters herein describe.

## CAUSES OF ACTION

### COUNT 1- ALIENATION OF AFFECTION

81. *Prior Allegations.* Plaintiff repleads, realleges, and incorporates by reference each and every allegation of paragraphs 1 through [80], inclusive, herein.

82. At all times since the birth of the Child until the occurrences set forth in this Complaint, the Plaintiff was a faithful and dutiful Father, and provided a comfortable environment for the Mother to help raise the Child.

83.  Prior to the actions and interference of Defendants, as set forth hereinafter, the Plaintiff and Child had genuine love and affection existed between them and still are attempting to maintain this today.

84.  On information and belief, during a period beginning sometime in late 2012 and during the following months and years to date, the Defendants by persuasion, direction and execution and with the actual knowledge of the close and loving relationship existing between the Plaintiff and his Child, began to willfully and deliberately seduced, enticed and alienated the affections of the said Child to destroy the love and affection, which previously existed between the Plaintiff and his Child and to wrongfully and maliciously injure the Plaintiff and to deprive the Plaintiff of the company, society, assistance and services of said Child.

85.  On information and belief, the Defendants' efforts to willfully alienate the affections of the Child from the Plaintiff, include but are not limited to the following acts: (i) Mr. Dunn had sexual intercourse with the Mother in Brazil and other locations, while the Defendants directed the Mother not to allow the Child to visit the Father; (ii) the Defendants took the Mother out socially to bars and restaurants in Brazil and Georgia and denied the Father visitation time; (iii) the Defendants scheduled to meet the Mother after their work and did meet the Mother out socially at bars, hotels or motels, and restaurants in Brazil and Georgia; (iii) The Defendants overtly flirted with the

Page **26** of **53**

Mother in front of said Child; (iv) The Defendants and the Mother would rendezvous after work and the Mother would stay out late at night or all night without telling the Child of her whereabouts; and (v) while on vacation with the Child, Mr. Dunn called the Mother often at the Plaintiff's Long Island residence on more than one occasion and Mr. Dunn met the Mother in New York City without telling the Child or her Father where the Mother was.

86. The Defendants, both openly and clandestinely, wrongfully and maliciously attempted to injure, and did injure the Plaintiff and his parental relationship existing with his Child; attempted to alienate and did alienate the affections of the Child from the Plaintiff.

87. Because of the aforesaid malicious, intentional and unjustified actions of the Defendants, the genuine love and affection, which previously existed between Plaintiff and the Child, was alienated and almost destroyed. In addition, due to Defendants' conduct, the Plaintiff has lost the affections, society, companionship, assistance and services of his Child, and has suffered a loss of support, injury to his physical and mental health, feelings, and reputation, and has had his relationship with his Child was almost destroyed. Moreover, the Plaintiff has suffered great mental and emotional anguish. Plaintiff has also been greatly embarrassed, humiliated and emotionally distressed.

88. The actions of the Defendants in alienating the affections of Child were willful, aggravated, and malicious and wanton, with reckless indifference to the constitutional rights and feelings of Plaintiff and with the knowledge that Plaintiff would be greatly distressed and humiliated thereby.

89. Due to the injuries to the Plaintiff and the Child as herein alleged, the Plaintiff has suffered the loss of his constitutional right to enjoy and educate his Child since the Defendants and the Mother developed their plan to "erase the Father from the Child's life". The Plaintiff has lost his fellowship with the Child and has been deprived of her normal companionship, affection, love and of his cooperation in maintaining a normal life, enjoyed under a normal parent-child relationship.

90. At all times prior to Plaintiff's injuries resulting from Defendants' intentional and negligent acts, the Plaintiff and the Child had a happy and close relationship. The Plaintiff derived much comfort, aid, and love from the Child, and engaged in the customary parenting acts with normal and usual frequency. Because of the injuries herein alleged to the Plaintiff and the Child, the Plaintiff has been deprived of parenting time and the enjoyment of his Child, which he ought to have had and otherwise would have had. The Plaintiff, during all such time, suffered and will suffer, in addition to the loss and deprivation of the comfort, education and enjoyment of his Child and the Plaintiff and the Child have suffered great mental anguish.

91.  Damages. As a proximate result of the conduct of Defendants, the Plaintiff has suffered

damages (i.e., general, punitive and exemplary) not yet ascertained, but reasonably

believed to be in excess of the minimum jurisdictional limits of this US District Court.

### COUNT 2- VIOLATION OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS TO ENJOY HIS CHILD

92.  *Prior Allegations.* Plaintiff repleads, realleges, and incorporates by reference each and

every allegation of paragraphs 1 through [91], inclusive, herein.

93.  The Defendants had actual knowledge of the relationship of the Plaintiff, Mother and

Child, and with wrongful and malicious intent sought to injure, disgrace, distress and

humiliate the Plaintiff and to deprive the Plaintiff of the company and a normal parent-

child relationship with his Child. The Defendants did this, in part, by directing,

orchestrating and paying hundreds of thousands of US dollars for many lawyers to

represent the Mother (who stated she was poor) to gain sole control over the Child so

Mr. Dunn could enjoy the Mother's "illegal or unpaid services" in Atlanta and not have

to travel to Brazil to enjoy these immoral services.

94.  On information and belief, Mr. Dunn had sexual intercourse with the Mother for money

and gifts at many locations and unknown to the Plaintiff and at the residence where the

Child resided.  During this time, Mr. Dunn may have been legally separated, but not

divorced, and these acts above may have severely affected the Plaintiff's relationship

with the Child

95.  The acts of sexual intercourse between Mr. Dunn and the Mother as well as the physical acts toward the Child to show the Mother his supposed affection for the Child caused Plaintiff and Child to suffer mental anguish, humiliation, injury to his physical and emotional health and the loss of large amounts of money to paid to the Plaintiff's lawyers to regain and protect his rights to enjoy and educate his Child, resulting in the Plaintiff suffering substantial actual damages.

96.  The exclusive rights and privileges of the Plaintiff's Constitutional rights to enjoy and educate his Child were invaded and curtailed for years and the Plaintiff suffered shame and the disgrace, which the acts described here produced.

97.  The Father/Daughter relationship was dishonored, destroyed, and the right to enjoy fellowship the Child's company, cooperation, love and affection was substantially and damaged and almost lost by the intentional, negligent and illegal acts of the Defendants.

98.  Plaintiff's mental anguish, humiliation, oppression, loss of parenting time, embarrassment, emotional turmoil and injury and loss of his finances and assets has continued unabated and will continue, all to the Plaintiff's continuing damage and injury.

99.  The actions of Defendants give Plaintiff a cause of action for breach of the Plaintiff's constitutional rights to enjoy and educate his Child and a serious breach of his due process rights in Fulton County, Georgia Superior Court.

100. The U.S. Supreme Court has long held that the 14th amendment to the U.S. Constitution guaranteed certain fundamental rights, which cannot be removed without due process of law. One of these fundamental rights is the right of parents to direct the upbringing and education of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. (Yoder, 1972).

101. Considering this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children. (Troxel, 2000). Clearly, the U.S. Supreme Court continues to uphold the right of parents to direct the upbringing of their children's education, including the right to direct their children's education.

102. Some parents "may at times be acting against the interests of their children" ... creates a basis for caution, but it is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interest. The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition. (Parham v. J.R.)

103. The Defendants knew the Plaintiff was the Father of the Child. The Defendants acted as a joint tortfeasors because the Defendants had a "bigger wallet", more financial resources and legal expertise than the Plaintiff. The Mother put her economic well-being ahead of the Child as she was being paid by the Defendants to provide services to them and attack the Plaintiff, the Child's Father, and this is not in the best interests of the Child.  For almost three years, the Defendants have continuously sought to deny the Plaintiff's parental rights to his minor Child because they know that the Mother was totally dependent on the Defendants.

104. Damages. As a proximate result of the conduct of Defendants, the Plaintiff has suffered damages (i.e., general, punitive and exemplary) not yet ascertained, but reasonably believed to be more than the minimum jurisdictional limits of this US District Court.

**COUNT 3- INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DURESS**

105. Prior Allegations. Plaintiff repleads, realleges, and incorporates by reference each and every allegation of paragraphs 1 through [104], inclusive, herein.

106. On or about January 2014 and on many prior and subsequent occasions, the Defendants' intentionally, willfully and maliciously and without any just cause or provocation caused the Plaintiff severe emotional duress.

107. The Defendants intentionally developed a plan to have the Mother reside in Atlanta as soon as possible with the Child.  This plan was a calculated plan to cause Plaintiff

emotional harm. The Defendants knew the Plaintiff was the Father of the Child and the Plaintiff had lived with, supported and loved the Child since her birth.

108. Mr. Dunn, was not divorced after a long battle with his first wife, so he could not marry the Child's Mother. Yet, the Mr. Dunn wanted to: (i) continue his sexual relationship with the Child's Mother in Atlanta and not have to fly to Brazil for sex; (ii) maintain secrecy in order to reach a more favorable financial divorce settlement with first wife; (iii) maintain secrecy so Mr. Dunn could continue his eight (8) year paramour and sexual relationship with his company's female CFO, who was the known reason for the divorce action by Mr. Dunn's first wife and (iv) hide Mr. Dunn's inappropriate advances to the Child, which may have come to light if the required mental examinations, recommended by the Brazilian Court's Child's guardian, were done in Brazil.

109. The Defendants' plan was to make alleged false misrepresentations of material facts to US Immigration officials. Upon information and belief, the experienced immigration lawyer (also a Defendant) was retained to procure the Child's Mother a H3 temporary US work visa and the lawyer, her partners or associates may have known of the fraudulent plan. Mr. Dunn controlled ABG, which sponsored the Child's Mother's H3 temporary US work visa application and he was listed as her "supervisor". The Mother's H3 visa was issued on or about December 15, 2014. This H3 Visa would allow the Child's Mother to enter the USA and stay for up to two years. It was not disclosed to US

immigration that the Mother would be living with Mr. Dunn in his room, he was her

boss at work, he was paying for her illegal sexual services because the Mother was

totally dependent on Mr. Dunn's financial resources. The Child had a Father (a US

Citizen) and the Mother did not have custody of the Child.

110.  The Defendants' plan needed to be carried out in secret (except for Mr. Dunn's family,

co-Defendants, close friends and many lawyers), public knowledge of Mr. Dunn's

relationship with the Child's Mother would have influenced: (i) the financial settlement

in divorce action; (ii) Mr. Dunn's ongoing relationship with the female CFO of his

company and (iii) maybe, most importantly, the customers of ABG and CAIO NA, mostly

Baptist church groups in the Southeast USA.

111.  The Defendants have intentional and reckless disregard for the Plaintiff's rights as the

Child's Father. The Defendants knew that the Plaintiff genuinely loved the Child and had

supported the Child and the Mother, for that matter, for many years.  The Defendants

knew the Child's Mother wanted money, clothes, gifts and a luxury car for herself, so

Mr. Dunn enlisted Mr. Middleton, his joint venture partner, to wire wages of $4,000

USD per month to Sao Paulo, Brazil as "wages" for Ms. Vianna's "no show job",

beginning in August of 2014.

112.  The Defendants knew the Ms. Vianna wanted to live in Atlanta to enjoy Mr. Dunn's

money and rich life style, but the Mother did not have a proper USA visa to allow her to

stay in the USA with the Child for a long period. The Defendants knew the Child was US
Citizen because the Plaintiff had "naturalized" his daughter to become a US Citizen a
few months after the Child was born in 2006. The minor Child could not sponsor the
Mother for US Citizenship and the Defendants dare not ask the Plaintiff, as they were
trying to "erase" him.

113. The Defendants knew of the criminal and civil risks for filing a false H3 visa application
and not reporting substantial changes in Ms. Vianna's position and duties in at ABG, the
visa sponsoring company, but they intentionally and recklessly disregarded these risks.

114. The Defendants failed to terminate the H3 visa (issued about December 15, 2014), after
his divorce was final in early January 2016. Nor did the Defendants seek a "fiancé visa",
as Mr. Dunn and Ms. Vianna were already engaged since May of 2014.  At all costs and
with illegal acts, Mr. Dunn wanted Ms. Vianna to be living with him in Atlanta, Ms.
Vianna wanted to be there to enjoy the Defendant's life style and his money and the
Defendants knew and wanted to cause the Plaintiff intentional infliction of emotional
harm.

115. The Defendants failed to terminate Ms. Vianna's H3 Visa, when the business between
CAIO and ABG ended in March 2015.  The Defendants did notify US Immigration to
terminate Ms. Vianna's H3 visa sponsored by ABG, as required under a H3 visa
regulations nor did the Defendant marry the Mother.  The Defendants continued the

alleged H3 visa benefit fraud from August 2015 until June 29, 2016, when he married

the Mother "for convenience" in a civil ceremony.  This marriage was done to continue

the Defendants' plan to gain control of the Child and to intentionally harm the Plaintiff.

Mr. Dunn and Ms. Vianna have signed a pre-nuptial agreement prior to their marriage

"for convenience" in June of 2016, so the couple may avoid visa benefit fraud and look

better to the Fulton County, Georgia Superior Court to gain physical custody and control

of the Child. These acts have intentionally caused and continue to cause emotional

stress to the Plaintiff because the Plaintiff has been stripped of all his financial resources

to have legal representation, due process and he has been forced to act on an indigent

and pro se basis.

116. Since meeting Mr. Dunn, the Child's Mother has been showered with lots of money,

gifts, etc.  Mr. Dunn has retained/directed the most expensive and allegedly corrupt

Brazilian lawyers to exploit the archaic Brazilian legal system leading ultimately to the

bribery of the Brazilian Judge, who then issued an order allowing the Child's Mother to

take the Child to Atlanta for up to two years based, in part, upon her H3 visa issued

because of visa benefit fraud and without the completion the mental examinations

recommended by the Brazilian Court's Guardian for the Child.

117. Third parties have a duty to respect the rights of the parents of a child.  The Defendants

knew the Plaintiff's Child was a naturalized US citizen, which meant the Mother had

previously acknowledged the Plaintiff was the actual and legitimate Father of the Child in Brazil.   Both the Plaintiff and the Mother swore the above to the US Government in 2006, three months after the Child was born. Thus, the Plaintiff was already the legitimate Father of the Child under Brazilian.

118. The Defendants knew that the Plaintiff was a loving and supportive parent. The Defendants knew the Ms. Vianna had never filed any tax returns, had no income, if any, until she met the Defendants. The Defendants knew Ms. Vianna was "totally dependent" on Mr. Dunn for her living expenses because she was a "kept woman" with a "no-show" job.  Regularly and continuously, the Defendants breached their duty as third parties by not allowing the Plaintiff to enjoy his Child.  The Defendants' continuous and cumulative conduct was outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and must be regarded as vicious and utterly intolerable in a civilized community.

119. *Intentional Interference with Education of the Child:*  In August of 2015, the Mother agreed to have Child tested for potential learning disabilities because the Plaintiff noticed some learning abnormalities in the Child during his July 2015 visitation. The Plaintiff had the Child tested by a reputable Atlanta testing service and it found the Child had some "learning disabilities". Extensive tutoring of three days per week was

recommended initially for reading only at $85.00 per hour. Math testing and tutoring was to follow.

120. On information and belief, Mr. Dunn directed the Mother and her lawyer (who the Defendant was paying) not to allow for any further educational and psychological testing of the Child at the Plaintiff's expense or at the expense of the Atlantic Public School System (APS) because the Defendants worried that this may allegedly show some forms of alienation or abuse by Mother and Mr. Dunn to the Child. Instead, the Mother was directed to claim the Child's grades were good, so further testing was not necessary.

121. The Mother brought the Child to private tutoring, which cost approximately $1,000 per month and was paid for by the Father, until his funds were exhausted by the tortious acts of the Defendants. On information and belief, Mr. Dunn did not financially participate in the cost of the tutoring to continue to exhaust the Plaintiff's financial resources by having the Plaintiff pay for 100% of the private tutoring for his Child.

122. The Plaintiff has had to pay extensive legal fees to have reasonable visitation with his Child. The Defendants paid and directed the Mother's lawyers to fight the Plaintiff as much as possible, so the Plaintiff would run out of financial resources to educate and tutor his Child. If the Plaintiff would have no monies to retain experienced Atlanta family lawyers to act on his behalf, then the Plaintiff would not have due process in the

family court system and the Mother would prevail. Thus, the Plaintiff has been forced to represent himself on a pro-se basis and fight for his rights. The emotional distress that the Plaintiff has suffered from the actions of the Defendants is medically diagnosable and significant and has required the Plaintiff to seek medical treatment.

123. The Defendants used their money and resources to break the financial back of Plaintiff because the Plaintiff was the only party that could disclose the Defendants' plans of fraud, misrepresentation and deceit against the Plaintiff and his Child.

124. After the Defendant and the Mother met in NY City in January 2014, the Plaintiff began to have extensive mental anguish after being the Defendants and the Mother tried to eliminated him from the Child's life. This "erasing" and "severely limiting" of the Child's relationship with her Father has continued for years.  Since 2014, the Defendants have hired lawyers after lawyers, bribed judges, refused to settle on any reasonable basis for the best interests of the Child and force the Plaintiff to give up his Constitutionally guaranteed rights to enjoy and educate his Child, existing both in the USA and Brazil. The Defendants' actions have caused the Plaintiff to have various physical injuries and serious mental health issues.

125. The foregoing acts by Defendants were willful and malicious and were intended to cause the Plaintiff physical, mental and emotional illness, fear and shock.  Consequently,

Plaintiff was caused severe emotional and mental suffering and distress, sleeplessness and aggravation.

126. The Defendants have willfully, maliciously and without legal right continued to do the wrongful acts and engage in the wrongful conduct toward Plaintiff and will continue to do the wrongful acts and engage in the wrongful conduct, causing plaintiff irreparable injury and damage, for which no adequate remedy at law exists.

127. As set forth more fully in this Complaint, the Plaintiff has suffered many severe and vicious attacks by the Defendants, that were extreme and outrageous and beyond the bounds of decency tolerated in this society.

128. The actions of the Defendants were intentionally designed to cause the Plaintiff severe emotional distress or were taken with reckless disregard of the significant probability of causing Plaintiff severe emotional distress. The actions of Defendants caused plaintiff to suffer severe emotional distress including, among other things, the aggravations to his physical health, mental health and created his inability to work. As a direct and proximate result of Defendants' extreme and outrageous conduct, the Plaintiff has suffered and continues to suffer severe emotional anguish and distress, and resulting bodily harm, including shock, nausea, loss of sleep, and intensified skin infections.

129. The Defendants' conduct in planning the fraudulent immigration to the USA of the Mother was intentional and malicious and done to causing Plaintiff to suffer mental

anguish by keeping control of his Child. The Defendants' conduct in confirming and ratifying these acts was done with knowledge that Plaintiff would suffer emotional distress and was done with a wanton and reckless disregard of the consequences to the Plaintiff.

130. The Defendants clearly exposed the Plaintiff to hatred, contempt, ridicule, and obloquy because it falsely depicted Plaintiff as a Father, who behaved many "bad acts" in a non-interested, non-loving manner to the Child and a Father that intentionally did not want to see his Child. The Plaintiff was also called a "terrorist".

131. The Defendants have used their financial superiority and an army of lawyers to keep the Plaintiff away from his Child by directing and financially supporting Ms. Vianna in such a way that any other Father would have given up long ago.

132. As a direct and proximate result of the Defendants' excessive expenditures for legal fees and outrageous acts, the Plaintiff has suffered humiliation, mental anguish, and emotional distress.

133. Defendants' acts in formulating, planning, and executing their multi-year plan to extinguish the Father (Plaintiff) from the life of his Child was relentless and evil. The plan was carried out, with the knowledge by Defendants, that their acts would cause Plaintiff to suffer great humiliation, mental anguish, and injury. The Defendants' acts

were, therefore, despicable conduct and so willful, wanton, intentionally and malicious and oppressive as to justify the award of exemplary and punitive damages.

134. *Intentional Infliction of Emotional Distress.* In doing the acts herein alleged, the Defendants, and each of them, pursued an outrageous course of conduct intentionally and/or recklessly, proximately causing Plaintiff severe emotional distress, shock, and other highly unpleasant emotions.

135. *Damages.* As a proximate result of the conduct of Defendants, the Plaintiff has suffered damages (i.e., general, punitive and exemplary) not yet ascertained, but reasonably believed to be in excess of the minimum jurisdictional limits of this US District Court.

136. Defendants owed a duty of reasonable care to Plaintiff and even a higher duty to the Plaintiff, as the Father of the Child.

137. Defendants, in the unreasonable and unjustified infliction of physical and emotional harm on Plaintiff, have breached their duty to Plaintiff.

138. The actions of Defendants in failing to act with reasonable care towards Plaintiff was negligent and it continues to be negligent.

139. Because of the negligence of Defendants, the Plaintiff has sustained severe physical and emotional damages, together with economic damages in the form of medical expenses and lost wages

140. *Consultations with Defendants.* The Plaintiff's investigator sought information concerning matters relating to his Child from Defendants. In such matters, Defendants represented themselves and held themselves out as having superior training, education, legal knowledge and most importantly the best attorneys that money could buy in Brazil and the USA.

141. *Defendants' Duty.* The Defendants are not the parents of the Child, and each of them, had and has a duty to Plaintiff, the Father of the Child, to act always with due and reasonable care for the best interests of the Child.

142. *Breach of Duty.* The Defendants, and each of them, breached said duty by acting and/or failing to act as alleged herein.

143. Assuming the Plaintiff is the non-custodial parent and the Child's Father, the Plaintiff repeats the allegations of breaches of duty on a negligent basis by the Defendants, as set forth above. Although the Plaintiff argues and believes that the Defendants' actions are "outrageous conduct", the Plaintiff also alleges that the Defendants breached their duty in a negligent way to the Plaintiff to enjoy his Child in the same ways as set forth above.

144. The Defendants negligently interfered and are continuing to interfere with the Plaintiff's rights to educate, enjoy and visit his Child by putting up many barriers against the

Plaintiff. Because of the conduct of the Defendants, the Child's relationship with the Plaintiff, the Father, was severely diminished and curtailed.

145. The Defendants have themselves executed and directed third parties and the Mother to use their resources to "break the back of Plaintiff". The Defendants' actions have caused the Plaintiff to have various, extensive physical injuries and substantial mental health issues.

146. *Foreseeability of Injury.* At all times herein mentioned, it was foreseeable to the Defendants that as a proximate result of their conduct as alleged herein, Plaintiff would be caused to suffer severe emotional distress, shock, and other highly unpleasant emotions.

147. *Damages.* As a direct and proximate result of the negligence of Defendants, and each of them, as aforesaid, Plaintiff has suffered damages in excess of the minimum jurisdictional limits of the US District Court.

148. *Damages.* As a proximate result of Defendants' conduct as alleged herein, the Plaintiff suffered severe emotional distress, shock, and other highly unpleasant emotions, which have injured Plaintiff in a sum not yet ascertained but in a sum reasonably believed to be in excess of the jurisdictional minimum.

**COUNT 4- BREACH OF GOOD FAITH/FAIR DEALING IN VIOLATION OF FIDUCIARY DUTIES**

149. *Previous Allegations.* Plaintiff repleads and incorporates by reference each and every allegation of paragraphs 1 through [148], inclusive, herein.

150. *Fiduciary Duty of Good Faith and Fair Dealings.* At all times, herein relevant, the Defendants had a duty to act in good faith and deal fairly with Plaintiff because of his constitutional rights as the Father of the Child. The Defendants thereby assumed a fiduciary duty and had obligation to Plaintiff and agreed to abide by their fiduciary duties. Nevertheless, the Defendants refused and failed to act in good faith and deal fairly and have breached said fiduciary obligations as set forth more particularly in this Complaint.

151. *Bad Faith Conduct of Defendants.* In the absence of a reasonable basis for doing so, and with full knowledge and/or reckless disregard for the consequences, the Defendants have failed and refused to abide by the laws of the USA and the States of Florida and Georgia.

152. *Elements of Bad Faith Conduct of the Defendants.* The Defendants and each of them engaged and continue to engage in a course of conduct to further their own economic interests in violation of their fiduciary duties and obligations to Plaintiff including but not limited to: (i) Misrepresentation of material facts to U.S. Immigration, the Internal Revenue Service and the Atlanta Public Schools (APS); (ii) Unreasonable delays in acting upon Plaintiff's rights for visitation; and other wrongful and illegal conduct; and (iii) their said conduct was and is of a continuing nature and that violates the U.S. Immigration Laws and laws in the State of Georgia.

153. *Delayed Visitation Processing*. The Plaintiff filed for his Child visitation almost immediately after the Child entered the USA on May 3, 2015. The Defendants delayed several months in acting on his requests after the Plaintiff's first visit, during which time Defendants directed Ms. Vianna to delay and delay, the Defendants directed the Mother's attorney on several occasions to say to the Plaintiff's attorney that a settlement was going to happen and it was just a delay tactic. However, the Plaintiff's attorney could not get any response to several settlement proposals from June 2015 to October 2015, when the Plaintiff filed for an immediate temporary hearing, which to date has never been held.

154. *Pattern of Unfair and Tortious Acts and Conduct*. Plaintiff is informed and believes and thereon alleges that said conduct of the Defendants was an instance of a larger pattern of conduct involving the claims of other similarly situated Fathers throughout the USA within the past several years and up to the present.   In pursuing said wrongful course of conduct herein, the said Defendants were pursuing patterns of behavior to undermine the laws of the USA.

155. *Nature of Conduct.* The above course of conduct was pursued intentionally and maliciously and without due regard for, and in reckless and conscious disregard for, the rights, financial and emotional circumstances of Plaintiff.

156. *Motives for Conduct.* The Defendants pursued said course of conduct always to deny the Plaintiff's constitutional rights to his enjoy and educate his Child, to further the Defendants' own economic interests at the expense of Plaintiff's economic interest, mental health, and well-being and to engage in sexual acts for compensation (in cash or in kind), which is illegal in the US, leading to alleged human smuggling and child trafficking, which is also illegal in the USA.

157. *Effect of Defendants' Conduct—Distress on the Plaintiff.* As a direct and proximate result of the conduct of said Defendants and each of them, the Plaintiff and most likely the Child have suffered emotional and mental distress all to his general damage in an amount not yet ascertained, but which is in excess of minimum jurisdiction amount of the US District Court.

158. *Effect of Conduct—Economic Injury.* As a further direct and proximate result of the conduct of said Defendants and each of them, Plaintiff has incurred and will incur economic detriment including but not limited to, loss of income, attorneys' fees, costs and expenses of litigation, and other special damages in an amount not yet ascertained.

## COUNT 5- FRAUD, INTENTIONAL AND NEGLIGENT MISREPRESENTATION AND NON-DISCLOSURE OF MATERIAL FACTS

159. *Prior Allegations.* Plaintiff repleads, realleges and incorporates by reference each and every allegation of Paragraphs 1 through [158], inclusive, herein.

160. *Representation by Defendants.* The Defendants represented to Plaintiff's attorneys in Brazil and the USA various facts and circumstances that were fraudulent, were material misrepresentations of facts and were made in bad faith.

161. The Defendants have misrepresented and did not disclose material facts to U.S. Immigration and/or to their immigration attorney, also a Defendant. The Defendants have tried to cover up their visa benefit fraud and their tracks by not responding or even acknowledging their receipt of valid subpoenas to Defendants ABG and CAIO NA from the Fulton County, Georgia Superior Court issued to their respective companies, when Defendants Dunn and Middleton were and are the authorized representatives for service in those companies. The subpoenas were issued on April 6, 2016 and no response has come from either of the Defendants, ABG and CAIO NA.

162. The Defendants have not been charged with any criminal or civil violations to date because the visa benefit case is not about a "bomb" or a terrorist activity in the USA and the US Attorney in Atlanta may have refuses to prosecute this case because this case because it involves a small number of people in visa benefit fraud, human smuggling and child trafficking.

163. Upon information and belief, under *FRAUD—FALSE STATEMENT ON IMMIGRATION DOCUMENT (18 U.S.C. § 1546(a)),* a defendant may be charged for a false statement on an immigration document in violation of Section 1546(a) of Title 18 of the United States

Code. For the defendant to be found guilty of that charge, the government must prove

each of the following elements beyond a reasonable doubt:  First, the Defendants must

have made a false statement.  Second, the Defendants must have acted with knowledge

that the statement was untrue. Third, the statement was material to the activities or

decisions of the Homeland Security and other sister agencies; that is, it had a natural

tendency to influence, or was capable of influencing, the agency's decisions or activities;

Fourth, the statement was made under oath or penalty of perjury. Fifth, the statement

was made on an application, affidavit, or other document required by immigration laws

or regulation. In connection with crimes charged under 18 U.S.C. § 1546(a), Materiality

is a requirement of visa fraud under subsection (a) and presents a mixed question of

fact and law to be decided by the jury. A statement need not have influenced the agency

decision to meet the materiality requirement.

164. Upon information and belief, FRAUD—USE OR POSSESSION OF IMMIGRATION

DOCUMENT PROCURED BY FRAUD (18 U.S.C. § 1546(a), a defendant may be charged

with fraud in the use or misuse of an immigration document in violation of Section

1546(a) of Title 18 of the United States Code. In order for the defendant to be found

guilty of that charge, the government must prove each of the following elements

beyond a reasonable doubt: First, the defendant knowingly uttered, used, attempted

to use, possessed, obtained, accepted, received, an immigrant or a non-immigrant visa,

permit, border crossing card, alien registration receipt card or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States; and Second, the defendant knew the document to be forged...falsely made, to have been procured by means of any false claim or statement or otherwise...  Mistake or ignorance of the law is no defense to a charge of "knowingly ... accept[ing], or receiv[ing]" forged documents in violation of 18 U.S.C. § 1546(a). Specifically: Whoever knowingly ... utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.

165. *Falsity of Representation.* The said representations of material facts by the Defendants were false, in that Defendants did not intend allow the Plaintiff to educate, enjoy and visit his Child, except if a court so ordered and this was done to cover-up, in part, their visa benefit fraud.

166. *Knowledge of Falsity and Intention of Representation.* The said Defendants knew that said representations were false and fraudulent at the time they were made and

continued to make such false and fraudulent representations for the purpose of inducing the Plaintiff to rely thereon to his detriment. On information and belief, Plaintiff alleges that said Defendants have made similar false and fraudulent representations to Homeland Security and other sister agencies, who have justifiably relied thereon to their detriment.

167. *Reliance by Plaintiff.* Plaintiff reasonably and justifiably relied on said representations and the fiduciary relationship between the parties.

168. *Defendants' Intent.* Defendants pursued said course of conduct intentionally, maliciously, oppressively in conscious disregard of the rights of Plaintiff, fraudulently with reckless disregard of the likelihood of causing Plaintiff emotional and mental distress, and/or at all times to further their own economic interests at the expense of Plaintiff's economic interest, mental health, and well-being.

169. *Lack of Basis for, and Other Instances of, Representations.* Defendants made such statements with no reasonable basis for believing such statements to be true. Plaintiff is informed and believes and thereon alleges that Defendants have made similar statements and such false representations to the Plaintiff, the Courts and to Homeland Security and their sister agencies with no reasonable basis for believing them to be true and that the Plaintiff and others have relied thereon to their detriment.

170. *Relief by Plaintiff.* Plaintiff, at the time said representations were made, were ignorant of their falsity.

171. *Nature of Defendants' Conduct.* Defendants pursued said course of conduct intentionally, maliciously, oppressively and in conscious disregard of the rights of Plaintiff, fraudulently and/or recklessly with disregard of the likelihood of causing Plaintiff emotional and mental distress, and/or at all times to further their own economic interest at the expense of Plaintiff's economic interest, mental health and well-being.

172. *Damages.* As a proximate result of the conduct of said Defendants and each of them, Plaintiff has suffered losses of $500,000 in addition to suffering emotional and mental distress and general and special damages all to her damage in a sum not yet ascertained but which is in excess of the jurisdictional minimum of the US District Court.

### PRAYER FOR DAMAGES AND RELIEF

WHEREFORE, plaintiff prays judgment against Defendants, and each of them, as follows:

A.    For general damages for severe emotional distress and mental suffering and each of the other counts alleged according to proof; but in excess of $3.0 million (USD); and for interest on this amount at the legal interest rate.

B.    For punitive and exemplary damages in an amount to be determined at trial;

C.    For lost wages and business opportunities per proof;

D.  For items of special damages including, but not limited to legal costs and all expenses relating the Plaintiff's quest for custody, visitation, etc. in Brazil and Georgia determined at trial.

E.  For reasonable attorneys' fees and costs and expenses of this litigation; and

F.  For any other and further relief that the court may deem just and proper.

Dated May 5, 2017

**James P. Sletteland, Acting Pro Se**
201 S. Ocean Grande Drive, Unit 105
Ponte Vedra Beach, Florida 32082
631-338-0159
Jsletteland@eagroupbrazil.com